2026 IL App (4th) 241389

NO. 4-24-1389

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 23, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| GARY A. IRBY III, | ) | No. 21CF701 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Paul P. Gilfillan, |
| | ) | Judge Presiding. |

---

JUSTICE LANNERD delivered the judgment of the court, with opinion.
Presiding Justice Steigmann and Justice Doherty concurred in the judgment and
opinion.

**OPINION**

¶ 1        On May 30, 2024, a jury found defendant, Gary A. Irby III, guilty of first degree murder and found the State proved its allegation defendant had personally discharged a firearm. On August 2, 2024, the trial court sentenced defendant to a term of natural life in prison. That same day, defendant filed a motion to reconsider his sentence. Later that month, defendant filed an amended motion to reconsider his sentence. On October 23, 2024, the court conducted a hearing on the motions to reconsider sentence, including any oral amendments defendant requested at that time. While the court's order denied defendant's motion to reconsider his sentence, it is clear from the record before us this order encompasses the amended motion to reconsider and any oral amendments defendant requested at the hearing.

¶ 2        Defendant appeals, raising several issues. First, he argues the trial court violated

his sixth amendment (U.S. Const., amend. VI) right when it found he forfeited his right to counsel based on his severe misconduct. Second, he claims the court violated his right to a fair trial when it denied him the opportunity to present an alibi defense. Third, defendant maintains the court erred by denying his motion to dismiss the grand jury's indictment against him. Fourth, and finally, he asserts the court failed to exercise its discretion by failing to consider his claim his sentence violated the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11). We affirm.

¶ 3                                   I. BACKGROUND

¶ 4                            A. Grand Jury Proceedings

¶ 5           In October 2021, the State charged defendant by information with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2020)) related to the death of Jerry Snipes. Later, in November 2021, at a hearing before a grand jury, the State presented a proposed three-count bill of indictment (two counts of first degree murder and one count of aggravated battery). Detective Scott Hulse of the Peoria Police Department offered the following testimony regarding the alleged offenses to the grand jury.

¶ 6           Police officers were called to the 2800 block of Linn Street on October 6, 2021, at 4:40 a.m. after "[t]wo ShotSpotter activations." Responding officers found the victim, Snipes, had been shot multiple times. Moments before dying, Snipes said, "[T]hat bitch set me up."

¶ 7           The police obtained surveillance footage from a residence at 2811 North Linn Street that showed a dark-colored SUV traveling north on Linn Street. Moments later, a white four-door sedan also "roll[ed] through the block." Shortly thereafter, a Black female could be seen walking southbound on Linn Street and up the driveway toward the residence at Linn Street, "manipulating a cellular phone in one of her hands" for several moments, and then walking back toward the street.

Then eight gunshots were heard on the recording. The young woman looked toward the direction of the gunshots and ran in that direction. After the woman was out of the camera's view, one more distinct gunshot could be heard.

¶ 8        A postmortem examination of the victim showed he had been shot multiple times with a handgun and at least one time with a large-caliber gun, presumably a shotgun because buckshot was found inside the close-contact wound.

¶ 9        Members of the victim's family identified Tryanique White as the female in the surveillance video. White's mother, Ivy Smith, came to the crime scene and asked questions regarding whether her missing 2019 Nissan Pathfinder had been involved in the incident. Smith indicated her daughter had taken the vehicle without her permission. After the Pathfinder was later found and examined, it appeared something had been wiped off the rear passenger door. Human blood was detected on the door.

¶ 10       At the scene of another shooting that happened on the south side of Peoria on October 4, 2021, the police recovered five 9-millimeter shell casings and two spent .410 shotgun shells. The police determined the spent 9-millimeter shell casings found at the scene of Snipes's death matched the 9-millimeter shell casings recovered at the scene of the October 4 shooting. In addition, police records indicated Jeremy Moore had been in possession of three Winchester Super X .410 #4 shotgun shells on July 28, 2021. The police determined those shells were the same make, model, manufacturer, and style as the shotgun shells found at the scene of the shooting on October 4, 2021.

¶ 11       The police then determined Moore was on probation and had an ankle monitor. Pursuant to a search warrant, the police obtained information from the GPS monitor Moore was wearing. The police were able to track Moore's prior movements and placed Moore both at the

scene of the October 4 shooting and the scene of Snipes's death on October 6. Pursuant to another search warrant, the police sought information from the probation department regarding any other individuals on probation who had been around the area where Snipes was killed at the time of the shooting. The police learned defendant was in the 2800 block of Linn Street at the time of shooting on October 6. Pursuant to a subsequent search warrant, the police received information regarding defendant's movements. When the police examined the movements of both Moore and defendant, the police placed both individuals at the scene of Snipes's shooting and at defendant's house on 321 East Frye Avenue after the shooting. The police also determined both men went to a McDonald's restaurant on Knoxville Avenue and the Taft Homes together that night.

¶ 12        Additional surveillance footage obtained by the police "pretty much indicated" defendant and Moore had been in a white Chrysler 300 with black tinted windows and a large strip of black tape along the back bumper. Based on the GPS data the police had on Moore's movements, they determined Moore had been to a residence in Creve Coeur on October 2 and October 4, 2021. The police then found a white Chrysler 300 at the residence that "checked to Hanna Hermacinski." Later, the police stopped the Chrysler 300 and found Hermacinski in possession of a 9-millimeter pistol. The police arrested and questioned Hermacinski.

¶ 13        While being questioned, Hermacinski admitted she had been in possession of the gun found in her car. She also indicated she had loaned her car to a friend named "Bad News" for about five hours on a day she could not remember. Detective Hulse testified "Bad News" was a nickname for Moore. However, after further questioning, Hermacinski changed her story, explaining Moore contacted her on October 5, 2021, after she got off work. Detective Hulse then offered the following testimony:

        "[Hermacinski] drove over to the city of Peoria and picked [Moore] and a guy

named Guwop, street name for Gary Irby, up. They drove around multiple places in the city of Peoria during the next several hours[,] one of which was the McDonald's on Knoxville; the other one being the Taft Homes. She indicated they returned to Mr. Irby's residence on East Frye, specifically 321, and that they then asked for a ride over to Linn Street to see a guy named Luke."

Hermacinski told the police she drove the men to that area and pulled off the road where they directed her to do so.

¶ 14 Hermacinski said defendant was in the front passenger seat, using his phone to communicate with a female. Several times, defendant commented on how far a female was from them. Hermacinski indicated she thought something nefarious was going to happen. She told the police that defendant and Moore exited her vehicle after a dark-colored SUV passed them. Defendant had a black semiautomatic handgun with an extended magazine, and Moore had "what was described as a big ass shotgun."

¶ 15 Hermacinski told the police the two men were out of the car for about one minute. While they were gone, she heard multiple gunshots. The two men then returned to the vehicle. Moore had a red Apple iPhone, which the men indicated had been taken from the victim's person. Hermacinski said she then drove the men back to defendant's residence on Frye Avenue. Afterwards, according to Hermacinski, the same dark-colored SUV she saw on Linn Street pulled up next to her vehicle, and she observed a light-skinned Black female in the SUV. Hermacinski told the police she then left and went home.

¶ 16 After defendant was taken into police custody, the police executed a search of his residence and took possession of his cell phone. The police later determined White made multiple attempts to call defendant's cell phone after she had exited her vehicle on Linn Street before Snipes

was shot.

¶ 17    The grand jury returned a three-count bill of indictment, charging defendant with two counts of first degree murder (*id.*) and one count of aggravated battery (*id.* § 12-3.05(e)(1)).

¶ 18                                B. Pretrial Proceedings

¶ 19    On November 10, 2021, the trial court granted defendant's request for court-appointed counsel. On September 15, 2022, defendant indicated he wanted to represent himself. The court advised defendant he faced serious charges and should not make a rushed decision about proceeding *pro se*. On October 3, 2022, defendant withdrew his request to proceed *pro se*.

¶ 20    On December 22, 2022, defendant's court appointed attorney, Hugh F. Toner III, filed a motion for a *Krankel* hearing (see *People v. Krankel*, 102 Ill. 2d 181 (1984)) at defendant's request. According to the motion, defendant believed Toner was ineffective for failing to file various motions. Toner asserted he discussed these matters with defendant and the reasons he declined to file the various motions.

¶ 21    A week later, defendant filed a *pro se* motion for substitution of counsel, alleging he could not have a fair trial if Toner represented him. According to the motion, defendant and his attorney had numerous arguments about the case, they had not been getting along, defendant had only seen his attorney three times, counsel had made prejudicial remarks, and defendant had contacted the Illinois Attorney Registration and Disciplinary Commission (ARDC) about Toner.

¶ 22    On January 3, 2023, defendant filed a *pro se* motion for substitution of counsel based on Toner's ineffective assistance. This motion repeated his earlier claims.

¶ 23    Later that month, on January 25, 2023, the parties appeared on defense counsel's request for a *Krankel* hearing and defendant's request for a new attorney. At the hearing, the trial court told defendant he was not going to appoint a different attorney simply because defendant

claimed his court appointed attorney had not yet come out to meet with him or had not yet established a defense strategy. The court informed defendant he did not get to dictate to his court-appointed counsel what motions he must file on defendant's behalf. Defendant then indicated he wanted to proceed *pro se*. The court continued the matter until February 1, 2023, for defendant to receive admonishments regarding self-representation. Before that hearing was held, defendant filed a series of *pro se* motions.

¶ 24    At a hearing on February 1, 2023, defendant confirmed he still wanted to proceed *pro se*. The trial court questioned defendant about his age and education and admonished defendant about the difficulties of proceeding *pro se*. Defendant stated he understood he was charged with the offense of first degree murder.

¶ 25    The trial court told defendant that, if he were convicted of first degree murder and the jury found he personally discharged the firearm, the sentencing range would be 45 years to natural life without the possibility of parole and no day-for-day credit. Defendant indicated he understood. In addition, defendant acknowledged he had the right to an attorney. Defendant also said he had not been threatened or promised anything in exchange for proceeding *pro se* and was making this decision on his own. Defendant further indicated he was not under the influence of alcohol, drugs, or prescription medication, understood the State was seeking to imprison him, and understood the court could not give him advice or assistance with subpoenas, questioning witnesses, jury selection, objections, and motions. The court then allowed defendant to proceed *pro se* and Toner to withdraw from the case.

¶ 26    Defendant proceeded to file additional *pro se* motions. At a hearing on May 3, 2023, the trial court heard arguments and denied a variety of motions defendant had filed.

¶ 27    At a hearing on June 20, 2023, the trial court stated it received or read an *ex parte*

letter from defendant on June 15, 2023, asking for the appointment of counsel. The court read the letter into the record. Based on the court's experience with defendant over the course of this case, it believed defendant's letter was disingenuous and defendant wanted a lawyer with conditions. Yet, defendant insisted he wanted the court to appoint counsel for him.

¶ 28 The trial court responded it would consider defendant's request. However, the court told defendant:

> "If I were to appoint a lawyer for you, it would be without conditions. That lawyer would be told that [defendant] is your client. You are to partner with him so that this case can get to a resolution, or a disposition, or at least finality with or without your cooperation. He doesn't have to cooperate with you, but you have to cooperate with him or her.
>
> And a defense lawyer is not required to craft your defense. A defense lawyer is to evaluate the facts and the evidence and to suggest and secure or present a defense or at least force the State to prove its case. But the facts are what they are ***. The defense lawyers are not in the evidence manufacturing business. They are in the evidence presentation business.
>
> If you are going to be a difficult client for the next person, then that's on you. If you're going to be a difficult client with the lawyer trying to assist you or present evidence, that's on you.
>
> * * *
>
> It's the Court's opinion that the Defendant seeks delay, seeks continuances, other matters, lawyers, *pro se* motions for purposes of delay. He has had a year and eight months to lift a finger, to do what he claims should be done for him today,

and he hasn't done it."

Thereafter, the court advised defendant that, if he appointed an attorney to represent him, the attorney would determine what motions would be filed and would represent defendant with or without defendant's assistance or cooperation.

¶ 29        After a recess, defendant maintained he still wanted the trial court to appoint an attorney to represent him. The court then appointed the public defender and indicated the public defender would assign an attorney to represent defendant. The court also advised that defendant, if he was not satisfied with his newly assigned public defender, would be expected to proceed *pro se*, noting *pro se* admonishments had already been given. Although the court indicated a deadline for motions had already passed, the court gave defendant's appointed counsel until July 12, 2023, to file any motions counsel deemed appropriate.

¶ 30        On February 27, 2024, the trial court filed a written order, noting it received a "pseudo motion" from defendant dated February 20, 2024, requesting assistance of appointed counsel with attachments. The court stated defendant was repeating past claims regarding a lack of communication with both his prior counsel and his current counsel. Defendant also asked for a second public defender to be assigned to his case. The court ordered defendant's currently assigned public defender, Jonathan McEldowney, to meet with defendant by March 13, 2024, to discuss possible motions (and later advise defendant why or why not certain motions would or would not be filed), defense witnesses, general trial strategy, and review discovery not previously shared with defendant.

¶ 31        At a hearing on May 8, 2024, McEldowney moved to not only withdraw as defendant's attorney but to withdraw the public defender's office as counsel for defendant in any capacity. According to McEldowney, he did not believe he currently was capable of effectively

representing defendant because defendant had indicated he intended to physically assault McEldowney in open court. McEldowney specifically told the trial court:

> "Our last conversation, which occurred by phone this last Friday, during that conversation[,] to be brief[, defendant] indicated to me his intention to physically assault me in open court. Under those circumstances I do not believe I would be able to effectively represent him at trial, and it would be my position that by that act [defendant] has waived his—by that action his right to court-appointed counsel. We are asking for the Public Defender's Office to be withdrawn."

The court noted, "What I'm hearing here is a threat to the physical safety of [Mr. McEldowney], which would qualify—if it's ever established—as forfeiture by misconduct. That would allow the attorney to withdraw for the Defense." The court also noted defendant's "history of filing motions on his own even when he's represented by counsel."

¶ 32    The trial court questioned McEldowney about the context in which the alleged threat occurred. McEldowney told the court he had been on the phone with defendant for more than an hour discussing his defense and strategy. McEldowney and defendant did not agree on the appropriate trial strategy. After they were unable to resolve those disagreements, defendant threatened McEldowney.

¶ 33    Although McEldowney indicated he did not recall defendant's exact words, the trial court and McEldowney had the following exchange about what defendant said:

> "MR. McELDOWNEY: I will be as specific as I can.
>
> At the point at which our discussion broke down, [defendant] inquired as to what I was going to do, and I'm trying to remember the exact phrasing. But when he—I think he said when he messed me the fuck up this coming Wednesday, today,

what I was going to do when he would—I can't remember if he said fuck me up or mess me the fuck up. I inquired whether he was asking me a hypothetical as to what I would do if he hit me or—

THE COURT: Wait, wait, you took that to mean he would hit you?

MR. McELDOWNEY: I inquired if that's what he was saying, and we had a subsequent conversation that lasted over 10 minutes, which was bizarrely calm and matter of fact in which [defendant] reiterated and made it very clear that this was not just an angry outburst but he was conveying his clear intention to wait until my back was turned and to attack me in open court.

THE COURT: Well, I want to hear his words from your perspective.

MR. McELDOWNEY: I'm trying to remember the exact phrasing, but I believe he indicated that he intended to fuck me up. And when I asked if he was asking what would I do if he hit me, he made it clear that, no, I'm not talking about hitting you, I'm talking about fucking you up implying he meant—and we discussed the likely implications that it could potentially lead to new charges; and that I would be unable to represent him as counsel; and that he was aware that security would almost certainly intervene immediately. And he indicated to me that he had considered these consequences; that he would likely be tackled and tased and potentially face new charges; and that none of this phased him; and that it remained his intention come the next time he saw me in court to—and, again, I cannot remember if the phrase was, mess me the fuck up or fuck me up.

THE COURT: What about turning the back when the back was turned?

MR. McELDOWNEY: Judge, I—that's me paraphrasing. I don't think he

used that phrase precisely when my back was turned, but he repeatedly and as this conversation ended, told me to just wait, just wait; that I'd see come Wednesday, today, but that I was—the conversation—the back and forth and the communication was rather calm and direct. He asked questions about the potential consequences of that act, and we had a fairly, as I say, surprisingly, almost surreally calm conversation in which he clarified for me if I had any question, that he was not merely venting displeasure but was, in fact, stating an intention to physically attack me.

THE COURT: Okay. And that's the way—to you that was a clear and imminent threat that he was going to cause you physical harm in this case when he next saw you; is that right?

MR. McELDOWNEY: I don't know if he would be able to cause it before being stopped by courtroom personnel, but I was clearly convinced that he at least at the time that he was intending to."

¶ 34   Defendant denied threatening McEldowney, stating, "Nah, I definitely did not threaten him. I don't even know where that came from. He's stuttering." Defendant then told the trial court McEldowney was not prepared for his trial and expressed his displeasure with the representation he was receiving. Defendant noted he had sent complaints to ARDC about McEldowney. In addition, defendant told the court he was "a man of [his] word" and would have followed through if he threatened McEldowney.

¶ 35   The trial court stated McEldowney had indicated he had considered trial strategy, possible motions, and indicated he was ready for trial prior to defendant's threats. Defendant responded counsel was not ready for trial. The court replied a defendant is not always going to be

satisfied with his attorney's assistance and defendant could have made an ineffective assistance argument on appeal. However, the court indicated it now had to determine whether defendant was going to have to represent himself at trial.

¶ 36 The trial court asked McEldowney, "[I]n the context of preparing for trial and securing witnesses, did you discuss that topic with [defendant] over the last few months?" McEldowney said he had. McEldowney also indicated he had sent a writ to the Illinois Department of Corrections about bringing a potential impeachment witness in to testify. The court and McEldowney then had the following exchange:

"THE COURT: Okay. And have you desired from a strategy standpoint to bring in additional witnesses and/or alibi witnesses for your client?

MR. McELDOWNEY: There are some additional potential impeachment witnesses that I was still intending to reach out to and potentially have them come in as witnesses. [Defendant] has referred to an alibi witness and a desire to raise an alibi defense. I had come to the determination and am of the determination that would be directly against any reasonable trial strategy given what I've seen in discovery and do not intend to pursue an alibi defense if I am the attorney on the case.

THE COURT: Okay. Leading to the defendant's disappointment that he's not pursuing any applicable defense that the defendant thinks is appropriate, which is his job to determine if that is or not. If he's ultimately ineffective, some other tribunal will deal with that. But, right now, I'm convinced that he's considered those and is not prepared[,] from an officer of the court perspective[,] to present an alibi defense."

¶ 37      The trial court and Toner, who was defendant's first appointed counsel in this case, then had the following exchange about threats defendant directed toward Toner:

"MR. TONER: I can tell you that Mr. Irby threatened me physically, threatened to harm my children.

THE COURT: Was that on more than one occasion?

MR. TONER: Yes.

THE COURT: Approximately how many?

MR. TONER: I couldn't tell you.

THE COURT: Okay. And was that by phone, in person?

MR. TONER: It was in person.

THE COURT: Here at the courthouse or at the jail or?

MR. TONER: I know at the courthouse back in the holding cell.

THE COURT: Okay. And did you take those threats seriously? I mean, did you think those threats were real from your perspective, or that it was just a big joke, or what? Tell me what impact it had on you.

MR. TONER: I can say this. I think that they would interfere with a relationship as an attorney-client. I will say this that they certainly were disturbing. As far as speculating about what [defendant] may do, I can imagine, but I don't know if that needs to be reached for this kind of hearing.

THE COURT: And you took them seriously?

MR. TONER: I did.

THE COURT: Okay. And you were attorney in this case for [defendant]?

MR. TONER: For a while.

- 14 -

THE COURT: The record will show how long you were the attorney. But that occurred on a number of occasions?

MR. TONER: Yes.

THE COURT: Before I let you go and before I let—

MR. TONER: I would indicate that it also occurred after I was no longer his attorney, and he would be back in the holding cell.

THE COURT: And you were back there working on other cases?

MR. TONER: Correct.

THE COURT: And he would threaten you again?

MR. TONER: Yes.

THE COURT: How so? Words used.

MR. TONER: Again, physical harm, talked about inflicting it on my children.

THE COURT: Again?

MR. TONER: Again.

THE COURT: For another time?

MR. TONER: Yes.

THE COURT: Even after you weren't [his] attorney?

MR. TONER: Correct."

¶ 38    The trial court, defendant, and McEldowney then had the following exchange:

"THE COURT: Okay. All right. [defendant], did you make those threats of physical harm to either Mr. Toner or his family?

[DEFENDANT]: Not at all. I'm just wondering, like, okay, is there—I just

got a question for, like, like, they testimonies. Like, is there any evidence like recording videos of them? Is there any surveillance, I mean, stating these claims?

THE COURT: Supporting those claims?

[DEFENDANT]: Support. Exactly what I'm saying, Your Honor.

THE COURT: Well, I think you're astooped [*sic*] and/or familiar enough with the court system to recognize that communications between attorney and client are privileged. So, unless I'm mistaken there wouldn't be any recordings of this in existence to your knowledge would there be, Mr. Toner?

MR. TONER: No.

THE COURT: Mr. McEldowney?

MR. McELDOWNEY: No, Your Honor. And I should indicate [defendant] did specifically inquire as to whether or not we were being recorded before making threats."

¶ 39　　The trial court then admonished defendant of the charges he faced and the penalty ranges for those alleged offenses because his actions could result in either the forfeiture or waiver of his right to counsel. According to the court:

"All right. Those are the charges and the penalty ranges in play. You've been admonished that's what you're facing if you lose your right to an attorney.

Forfeiture from severe misconduct does not require any such admonishments to you, but in the event your forfeit or waive your right to an attorney by less severe conduct, you've now been officially admonished on that."

The court then indicated it needed to consider whether defendant may have forfeited or waived his right to counsel and whether the attorney-client relationship could be salvaged.

¶ 40        Two days later, at a hearing on May 10, 2024, the trial court learned defendant had made a phone call from the jail, which was recorded, after allegedly threatening McEldowney with physical violence on May 3, 2024. When questioned by the court, defendant still denied threatening McEldowney but acknowledged his phone call with McEldowney was "heated." The recording of defendant's phone call from the jail was played for the court. According to the State, in the recording, defendant referenced "putting his hands on his attorney" and later said something to the effect he was going to beat McEldowney's "ass."

¶ 41        The trial court found defendant's credibility lacking on this issue considering the statements by both McEldowney and Toner and the recording of defendant's phone call from the jail.

¶ 42        Next, the trial court discussed potential accommodations it could make to help safeguard McEldowney from defendant. However, McEldowney told the court he did not believe he could remain defendant's attorney and represent him at trial because of a total breakdown in communication between the two men. McEldowney stated he was not confident he could conceal his "own weariness and mistrust of the defendant" and did not believe he could effectively represent defendant at trial at that time.

¶ 43        In response, defendant said he did not want McEldowney to be his attorney but refused to waive his right to counsel. In other words, defendant wanted the trial court to appoint a different attorney to represent him. After discussing defendant's actions throughout this case, the court stated it did not need to determine whether defendant had waived his right to counsel because of his prior misconduct. Instead, the court found defendant's threats to physically harm his attorneys constituted severe misconduct that resulted in the forfeiture of his right to counsel without warning.

¶ 44        On May 22, 2024, the trial court held a *Boose* hearing (see *People v. Boose*, 66 Ill. 2d 261 (1977)) on its own motion. After the hearing, the court determined it was necessary to restrain defendant. The court ordered defendant's legs to be shackled and restrained at the floor during his trial.

¶ 45                               C. Trial Proceedings

¶ 46        Defendant does not argue on appeal the State did not present sufficient evidence for the jury to convict him of first degree murder in this case. As a result, we need not summarize the evidence presented at defendant's trial. However, defendant does assert the trial court erred in denying him the right to present an alibi defense through three witnesses who would testify that he was not at the scene of Snipes's murder but instead was at 321 East Frye Avenue in Peoria.

¶ 47        When the parties appeared for the jury trial on May 28, 2024, this alibi defense was discussed. Defendant wanted to call three witnesses who would testify defendant was at 321 East Frye Avenue in Peoria, presumably at the time of the charged offense. The State asked the trial court not to allow defendant to call those witnesses because the alibi defense had not been properly disclosed in a timely manner. The State explained the witnesses should not be allowed to testify because the State would be forced to track them down for interviews about the alleged alibi after defendant's jury had been selected. The State argued this defense and these witnesses should have been disclosed to the State long before the first day of defendant's trial. Further, the State claimed forcing it to investigate this defense after the trial had started was not fair. The State indicated the case should be continued if the court intended to allow defendant to present this defense.

¶ 48        The trial court then asked the State if it was requesting a continuance of "today's trial." The State responded affirmatively.

¶ 49        The trial court then asked McEldowney, who was present in the courtroom, whether

he and defendant had ever discussed an alibi defense. McEldowney said he and defendant had discussed the alibi defense and had disagreed about its strategic value. McEldowney indicated he had not filed anything related to the alibi defense.

¶ 50 Next, the trial court asked for defendant's response to the State's request for a continuance. Defendant objected, saying he was "ready for trial today." The court explained to defendant that the State was not 100% ready because of defendant's inaction.

¶ 51 After a brief recess, the trial court noted disclosure deadlines had passed in this case, whether to disclose and pursue an alibi defense was defense counsel's decision to make, and defense counsel consciously decided not to disclose and pursue the alibi defense. Although the State asked the court to bar the three witnesses from testifying at all, the court only granted the State's motion to the extent it barred defendant's three alibi witnesses from offering testimony regarding defendant's whereabouts between 4:10 a.m. and 5:10 a.m. on the day of the incident. The court indicated the State would have the right to interview the witnesses the next day and could present further argument, if needed, based on those interviews.

¶ 52 On the State's motion, the trial court dismissed count III of the indictment, which charged defendant with aggravated battery with a firearm.

¶ 53 On May 30, 2024, the jury found defendant guilty of first degree murder and found the State proved the allegation he personally discharged a firearm.

¶ 54 D. Posttrial Proceedings

¶ 55 On June 24, 2024, defendant filed a motion for a new trial. On July 26, 2024, defendant filed an amended motion for a new trial. After hearing arguments from the parties on defendant's posttrial motions, the trial court denied defendant's motion.

¶ 56 The trial court then turned to the sentencing hearing, indicating it had received and

read the presentence investigation report (PSI). The court allowed the parties to supplement the PSI with a victim impact statement from the victim's mother and letters from defendant's sister and grandfather. Defendant had no corrections or additions to the PSI but objected to the 25-year gun enhancement. The court stated the sentencing range for first degree murder with a firearm enhancement would be 45 years to natural life in prison, to be served in its entirety, and followed by a 3-year period of mandatory supervised release. Defendant stated he understood this was the sentencing range he faced. The State presented no formal evidence in aggravation, and defendant presented no evidence in mitigation, other than the two letters.

¶ 57        The State argued defendant arranged for Snipes, who was 17 years of age, to be brought to the location where he was shot 10 times and killed. The State pointed to defendant's prior history of delinquency and argued the deterrent effect of a significant prison sentence should be considered by the trial court. In addition, the State noted defendant's PSI was hundreds of pages long, beginning with records from when defendant was 13 years of age. The PSI showed defendant's persistent violent and antisocial behavior. Whether at school or in custody, defendant displayed violent and aggressive behavior consistent with what occurred in this case. Further, the State indicated defendant carried out Snipes's murder in a premeditated and cold manner. While acknowledging the imposition of a life sentence was rare, the State argued it was justified in this case, given defendant's demonstrated character for violence.

¶ 58        Defendant argued the sentencing range should be 20 to 60 years because the 25-year gun enhancement should not apply considering no eyewitness testified he personally discharged a firearm. While acknowledging he had disciplinary tickets while in custody as a juvenile, he stated he also had earned his high school diploma and completed other programs. Defendant also remarked this was his first adult conviction. In addition, defendant stated he had

worked at Caterpillar and Casey's General Store and had taken online classes to be a barber. According to defendant, he was innocent and a law-abiding citizen. When the trial court asked if he wanted to make a statement on his own behalf, defendant said he maintained his innocence.

¶ 59 Before imposing defendant's sentence, the trial court noted it had considered the PSI, the arguments presented by the parties, defendant's statement, and the statutory factors in both aggravation and mitigation. The court stated, "I'll attempt to cover what I feel is important, but just because one might be left out does not mean they all haven't been considered. I've considered the history and character of the defendant."

¶ 60 The trial court stated defendant was the ringleader in this case and orchestrated Snipes's murder in a "setup ambush." Despite overwhelming evidence against him, defendant maintained his innocence. The court found defendant's claim he was a law-abiding citizen shocking considering defendant's history. However, the court noted defendant's statement was consistent with his history of ignoring reality and many documented instances of lying.

¶ 61 The trial court also stated defendant had a dangerous disposition and a significant history of delinquency and criminal activity, including juvenile convictions for burglary and battery and a pending home invasion charge. The court also found defendant had caused a lot of problems at the juvenile detention center.

¶ 62 In addition, the trial court asserted a sentence in a case like this is significant to deter other individuals from taking someone's life. The court then sentenced defendant to a natural life sentence in the Illinois Department of Corrections. Defendant immediately filed a motion to reconsider sentence at the hearing. The court told defendant he had 30 days to amend his motion, if necessary.

¶ 63 In his motion to reconsider his sentence, defendant argued his sentence was

excessive, the trial court failed to follow the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. I, § 11), and "the sentence imposed [was] not in keeping with the defendant['s] past history or criminality, mental history, family situation, economic status, education, [and] occupational or personal habits." Defendant made no specific mention of anything regarding his status as an "emerging adult" for the court to consider.

¶ 64         On August 21, 2024, defendant filed an amended motion to reconsider his sentence. In the amended motion, defendant asserted his sentence was excessive considering the evidence the State presented at trial. Defendant also argued the trial court had not considered his employment history at Caterpillar and Casey's General Store, his mental health, and his accomplishments, which he alleged included earning his high school degree and employment certifications and obtaining his driver's license, a vehicle, and automobile insurance. According to defendant, his sentence violated the eighth amendment (U.S. Const., amend. VIII) and Illinois's proportionate penalties clause (Ill. Const. 1970, art. I, § 11) because the court failed to consider his youth and attendant circumstances when imposing the natural life sentence.

¶ 65         Further, defendant argued that the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), applied to him because he was under 21 years of age at the time of the offense, that the trial court abused its discretion pursuant to the eighth amendment (U.S. Const., amend VIII) and *Miller*, and that new scientific evidence shows individuals between the ages of 18 and 25 are developmentally different than older adults. In an affidavit attached to his amended motion, defendant continued to maintain his innocence.

¶ 66         At a hearing on October 23, 2024, the trial court indicated it had reviewed defendant's initial motion to reconsider his sentence and his amended motion, and the hearing was scheduled for both motions. The court also allowed defendant to orally amend the motions at the

hearing. Defendant argued he did not receive a fair sentencing hearing and asked for the minimum sentence without the 25-year gun enhancement. Defendant neither asked to present nor presented any evidence regarding the effect his age had on Snipes's murder.

¶ 67        The State asked the trial court to deny defendant's motions to reconsider his sentence. According to the State, defendant continued to make arguments regarding the facts of the offense itself, which was no longer at issue. Further, the State noted a full and detailed PSI was completed in this case and defendant was given the opportunity to present additional evidence. The State asserted defendant's claim he has a serious mental illness is not supported by any evidence other than a single report indicating defendant was having trouble sleeping, was experiencing anxiety despite exercising, and wanted to speak to a doctor about possibly receiving medication. In addition, the State argued the court considered the available sentences and provided a full explanation why it was imposing a natural life sentence. As for defendant's allegations his sentence was cruel and unusual and violated the proportionate penalties clause, the State maintained his claim was meritless considering what he had done, his history before the offense, and his actions while in custody after the offense. Finally, the State argued *Miller* did not apply to him because he was not a juvenile at the time of the offense.

¶ 68        Defendant responded he believed his PSI indicated he had been diagnosed with post-traumatic stress disorder and had a serious mental illness. The trial court responded that information was in the PSI. The court said it had taken that information "into account," presumably when it determined what sentence to impose.

¶ 69        The trial court then addressed defendant's arguments. Based on the jury's findings, the court stated defendant was eligible for a sentence of 45 years to life. According to the court, it considered all the statutory factors when sentencing defendant. The court explained it believed

- 23 -

defendant had been in charge when the offense was committed. The court also noted numerous documents indicated defendant, while at the Peoria County jail, organized factions of inmates at the jail to run things in a "mini mafia scenario." The court did not deny referring to defendant as a "ringleader" and asserted the record would speak for itself. Finally, the court stated:

"I've taken into account your accomplishments as a juvenile. I took into account your claim of medical maladies. *Miller* does not apply to adults. You were an adult at the time this occurred.

And, so, at the end of the day I have reconsidered and I've gone back and at second glance do find that the sentence of natural life was appropriate then and remains so now. So, the motion will be respectfully denied."

¶ 70    This appeal followed.

¶ 71                                II. ANALYSIS

¶ 72    On appeal, defendant first argues the trial court violated his sixth amendment (U.S. Const., amend. VI) right to counsel when it removed his court-appointed attorney without warning or replacement. Next, defendant asserts the court violated his right to a fair trial when it barred three of his witnesses from providing testimony to establish an alibi defense. Defendant also contends the court erred by not dismissing the indictment, which he argues the State procured through misleading testimony. Finally, defendant argues the court failed to exercise its discretion regarding his claim that his sentence violated the Illinois Constitution's proportionate penalties clause (Ill. Const. 1970, art. 1, § 11) simply because defendant was not a minor when the offense occurred. While defendant proceeded without counsel at his trial, he is represented by the Office of the State Appellate Defender on appeal.

¶ 73                        A. Defendant's Right to Counsel

- 24 -

¶ 74 Defendant argues the trial court committed reversible error by violating his sixth amendment right to counsel when, without prior warning, it determined defendant forfeited this right. Moreover, defendant claims his actions did not rise to the level of *severe misconduct*. During oral argument, defendant's appellate counsel conceded a prior warning that defendant's continued actions could result in forfeiture of his right to counsel is unnecessary when a defendant has engaged in severe misconduct. Regardless, defendant also asserts a trial court must reasonably consider whether accommodations can be made to preserve a defendant's right to counsel *before* a defendant is deprived of that right, which defendant argues the court failed to do.

¶ 75 Defendant essentially concedes the trial court made a credibility determination and found that he threatened both McEldowney and Toner. Further, defendant does not challenge the court's determination the threats occurred. However, he argues the threats do not constitute severe misconduct and, therefore, are not sufficient to justify the forfeiture of his right to counsel without warning.

¶ 76 While defendant failed to properly preserve this issue for review, he asks this court to consider the issue pursuant to the plain error doctrine. The first step in any plain error analysis is determining whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. If a defendant can establish a clear or obvious error occurred, the court then evaluates whether "the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice" or "the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process." *Id.* ¶¶ 50-51.

¶ 77 According to defendant, the trial court's determination he forfeited his right to counsel was a clear and obvious error that constituted second-prong plain error because it affected the fairness of his trial and challenged the integrity of the judicial process. The State maintains

defendant failed to establish the court committed a clear or obvious error. According to the State, defendant both waived his right to counsel based on his continuing course of conduct and forfeited his right to counsel because of his severe misconduct.

¶ 78 A claim a defendant was improperly denied his right to counsel presents a legal question that we review *de novo*. *People v. Lesley*, 2018 IL 122100, ¶ 30.

¶ 79 A defendant's right to be represented by counsel at a criminal proceeding is a fundamental constitutional right. *People v. Ames*, 2012 IL App (4th) 110513, ¶ 44. "The Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings." (Internal quotation marks omitted.) *Missouri v. Frye*, 566 U.S. 134, 140 (2012).

¶ 80 "Although the right to counsel is a constitutional requirement, it may be relinquished in three ways: (1) waiver, (2) forfeiture, and (3) waiver by conduct." *Ames*, 2012 IL App (4th) 110513, ¶ 26. However, a trial court should exercise great caution before requiring a defendant to proceed without counsel. If a reviewing court determines a trial court erred in forcing a defendant to represent himself at trial, the harmless error rule will be inapplicable and reversal will occur even if the remainder of the proceedings were free from error. *Id.* ¶ 44.

¶ 81 In *Ames*, this court stated a defendant's severe misconduct can result in a defendant's forfeiture of his right to counsel without warning. *Id.* ¶ 37.

> "A trial court has the discretion to determine that the defendant's misconduct was so severe (such as physically attacking his defense counsel) that no warning of forfeiture of counsel was necessary or foreseeable before the court concludes that the defendant has forfeited his right to counsel and will be required to henceforth represent himself." *Id.*

¶ 82    In *People v. Payton*, 2023 IL App (4th) 220890-U, this court recently considered what types of misconduct by a defendant can be so severe that the misconduct forfeits a defendant's right to counsel without warning. (Although *Payton* was an unpublished order from this court, we cite it for persuasive purposes pursuant to Illinois Supreme Court Rule 23(e)(1) (eff. June 3, 2025)). According to this court's reasoning in *Payton*, a physical battery by a defendant is not the only type of severe misconduct that can result in the forfeiture of a defendant's right to counsel. *Payton*, 2023 IL App (4th) 220890-U, ¶ 56 (citing *United States v. Leggett*, 162 F.3d 237, 250 (3d Cir. 1998)). This court indicated serious misconduct "can include situations in which the defendant was verbally abusive, threatened to harm counsel, threatened to sue counsel, or tried to persuade counsel to engage in unethical conduct." *Id.* (citing *United States v. McLeod*, 53 F.3d 322, 325 (11th Cir. 1995)).

¶ 83    While defendant did not physically attack McEldowney, no such act is required to establish severe misconduct, as this court stated in *Ames* and *Payton*. Here, defendant made serious threats to physically harm McEldowney approximately two weeks before his trial was scheduled to begin. In addition, although defendant's conduct was not brought to the court's attention at the time, defendant had also threatened to physically harm his prior counsel (Toner) and prior counsel's children. Toner indicated defendant continued to threaten him even after their attorney-client relationship ended when they saw each other in the courthouse's holding area. As noted above, defendant does not challenge the court's factual determination these threats were made.

¶ 84    McEldowney brought the threats to the trial court's attention on May 8, 2024, at a pretrial hearing. Defendant's trial was scheduled for May 20, 2024. At the beginning of the hearing, the State indicated it would not be ready on May 20 and asked the court to continue the trial for approximately one week. After the court asked McEldowney whether the defense would

be ready for trial on either May 20 or a week later, McEldowney said no, indicating the public defender's office was moving to withdraw because defendant had threatened to physically assault McEldowney when they next saw each other. McEldowney indicated defendant made the threat during a telephone conference on May 3, 2024.

¶ 85　　While describing the threat to the trial court, McEldowney could not remember defendant's exact words. However, defendant essentially told McEldowney he was going to physically harm him when they next saw each other. McEldowney told the court he asked defendant to clarify what his threatening language meant. In what McEldowney described as a "bizarrely calm and matter of fact conversation," defendant clearly stated the threat was serious and not just an angry outburst.

¶ 86　　McEldowney told the trial court defendant indicated his intent to attack him in open court, repeatedly saying, "[J]ust wait, just wait." According to McEldowney, he and defendant even

> "discussed the likely implications that it could potentially lead to new charges; and that I would be unable to represent him as counsel; and that he was aware that security would almost certainly intervene immediately. And [defendant] indicated to me that he had considered these consequences; that he would likely be tackled and tased and potentially face new charges; and that none of this phased him; and that it remained his intention come the next time he saw me in court to—and, again, I cannot remember if the phrase was, mess me the fuck up or fuck me up."

In response to a question from the trial court, McEldowney asserted he was convinced defendant intended to follow through with his threats but was unsure if defendant would be successful, considering court personnel would be present.

¶ 87 After hearing from McEldowney and Toner, the trial court asked defendant if he threatened either attorney or Toner's children. Defendant denied making these threats. With regard to McEldowney, defendant stated, "Nah, I definitely did not threaten him. I don't even know where that came from. He's stuttering." However, defendant also indicated he was not pleased with McEldowney's representation, claimed counsel was not ready for trial, and made a complaint about McEldowney to ARDC. According to defendant, he was "a man of [his] word" and would have carried out any threat he made to counsel.

¶ 88 However, while denying he threatened either attorney, defendant also asked the trial court whether McEldowney or Toner had recordings of any of the threats they claimed he made. This is an unusual question considering defendant denied threatening either attorney. The court noted defendant had enough experience to know his conversations with his attorneys were privileged and presumably not recorded. Upon questioning from the court, both attorneys indicated they were unaware of any such recordings. However, according to McEldowney, defendant asked him whether their phone call was being recorded before he made the threats.

¶ 89 While McEldowney initially requested to withdraw as defendant's attorney, he also clearly asserted defendant had waived his sixth amendment right to counsel. After hearing from McEldowney, Toner, and defendant, the trial court did not immediately decide the question before it, stating it needed to determine whether defendant forfeited his right to counsel and also consider McEldowney's motion to withdraw. As a result, defendant had additional time to respond to the allegations against him and prepare an argument explaining why he was still entitled to counsel.

¶ 90 Two days later, at a hearing on May 10, 2024, the State presented a recorded phone call from defendant while he was in jail to an unidentified female after his telephone conference with McEldowney on May 3, 2024 (during which he was alleged to have threatened McEldowney).

When questioned by the court, defendant maintained he could not recall if he told anyone he had threatened McEldowney. However, while defendant denied threatening McEldowney, he acknowledged their telephone conference was "heated." The recording of defendant's phone call with the unidentified female was played for the court. The State indicated defendant referenced "putting his hands on his attorney" and later said something to the effect he was going to "beat [McEldowney's] ass." Considering the information presented, the court found defendant had threatened McEldowney, despite his denials.

¶ 91 When a court must determine whether a defendant's threat or threats rise to the level of *severe misconduct* justifying the forfeiture of his right to counsel, the court must view the defendant's conduct objectively, considering the totality of the circumstances in that particular case. In this case, although defendant was still presumed innocent when the threats were made, defendant was charged with murder, a violent and serious crime. Further, this was not a situation where defendant simply lost his temper, threatened his attorney, and later expressed sincere remorse for having done so. Instead, when McEldowney questioned defendant about the threats, defendant told McEldowney in a calm and deliberate manner that his threats were serious. Moreover, even after McEldowney told defendant such an action might result in additional charges, defendant indicated he had considered the consequences and still planned to proceed in harming McEldowney at the next court date.

¶ 92 When questioned by the trial court, defendant did not admit making the threats or express any remorse for doing so. Instead, he denied making the threats. Even when confronted with the jail call, wherein he acknowledged certain threats to the unidentified female caller, he claimed he could not recall telling anyone he threatened McEldowney. The court did not find defendant's denials credible.

¶ 93　　　　　Moreover, defendant's behavior involved intentional and deliberate acts designed to threaten his appointed counsel. This persistent course of conduct was not limited to one attorney. Both McEldowney and Toner advised the trial court defendant threatened them with physical harm while they were representing him. Additionally, Toner also indicated defendant threatened his children and continued to threaten him when defendant saw Toner in the courthouse's holding area.

¶ 94　　　　　Considering defendant told the trial court he was a man of his word and would follow through on any threat he made, the court had good reason to conclude McEldowney might be in actual danger while representing defendant. Based on the totality of the circumstances in this case, defendant cannot establish the court made a clear or obvious error (or any error at all for that matter) in determining defendant's misconduct in this particular case was so severe that, even absent a prior warning, defendant forfeited his right to counsel.

¶ 95　　　　　Defendant also argues the trial court erred by failing to reasonably consider whether accommodations could be made so that he could continue to be represented by McEldowney *before* ruling he had forfeited his right to counsel. According to defendant, the court could have shackled him, separated him from his attorney in the courtroom, or even placed him outside the courtroom and required him to participate in the trial remotely. On appeal, defendant argues any of these options would have been better for him than finding he forfeited his right to counsel.

¶ 96　　　　　Initially, we must address defendant's argument that a trial court must consider possible accommodations to salvage the attorney-client relationship *before* it determines a defendant's actions constitute severe misconduct. We disagree with this assertion. Whether accommodations may be made to salvage an attorney-client relationship is not relevant to whether the defendant's actions constitute severe misconduct. Future accommodations cannot reduce the

severity of the misconduct that has already occurred. That being said, when a threat is the basis of the severe misconduct at issue, a defendant's intent on following through on the threat is very relevant when determining whether a threat or threats rise to the level of severe misconduct. As a result, a defendant's actions after making the threat(s) are relevant and should be considered by the court in determining a defendant's intent.

¶ 97    Accordingly, the trial court should first determine whether the defendant's conduct constitutes severe misconduct. If so, the defendant has forfeited his right to appointed counsel. However, after such a determination is made, considering the importance of legal representation in a criminal case—both for the defendant and the orderly administration of the proceedings—and the fact that erroneously depriving a defendant of his right to counsel would require reversal, it would be prudent for a trial court to consider whether possible accommodations could salvage the particular attorney-client relationship at issue, even though the trial court has determined the defendant no longer has a constitutional right to counsel. Additionally, if accommodations cannot save the existing attorney-client relationship, this opinion should not be construed to preclude a trial court, in its discretion, based on the totality of circumstances in a given case, from providing a defendant with a new attorney even though the court determined the defendant forfeited his right to counsel.

¶ 98    However, in a situation where a defendant has forfeited his right to counsel but a trial court determines it prudent to impose accommodations preserving the current attorney-client relationship or to appoint new counsel, the court should provide the defendant with appropriate warnings—as discussed by this court in *Ames*, 2012 IL App (4th) 110513, ¶ 38—to avoid any further misconduct or risk the loss of counsel generously provided by the court regardless of defendant's forfeiture of his constitutional right to counsel. On the other hand, if the court

determines neither accommodations to salvage the attorney-client relationship nor the appointment of a new attorney would be appropriate after determining a defendant forfeited his right to counsel, the defendant would be required to proceed *pro se* unless he could obtain private counsel to represent him without unreasonable delay.

¶ 99 Here, the trial court did consider possible accommodations to preserve the attorney-client relationship. The court asked McEldowney if he could capably represent defendant pursuant to his obligations as defendant's attorney if safeguards were put in place to protect his personal security. The court told McEldowney:

> "And let me just throw that out there so you can continue [*sic*] it. For example, if the Court made accommodations such that there would never be any in-person, unrestrained contact between the attorney and the client. For example, all communications could take place in the holding cell where there's a door between you and people can hear between the door and the cell ***.

> \* \* \*

> And while in court, Defense Counsel can be seated at a separate table 10 or more feet away from the defendant, and the defendant potentially could be shackled at the legs so that there would be no threat of him moving from counsel table, which would never be seen by the jury, of course. If those types of safeguards were put in place, Mr. McEldowney, do you think you could remain his attorney and communicate with him and represent him at trial?"

McEldowney told the court:

> "Judge, at this time I do not believe I would be capable of doing so. There's been essentially a total breakdown in communication between us.

But quite apart from that, I am not confident at all of my ability to conceal from the jury my own weariness and mistrust of the defendant. I think it would thoroughly undermine my ability to effectively advocate for him, and I do not believe, under those circumstances, that I could effectively represent him at trial at this time."

¶ 100    However, in this case, regardless of whether accommodations were available, the record shows defendant told the trial court he did not want McEldowney to continue as his lawyer. Without considering at this point whether defendant made a formal waiver of his right to counsel, he clearly invited or acquiesced in the court not requiring McEldowney to continue representing him. In *People v. Liekis*, 2012 IL App (2d) 100774, ¶ 24, the Second District explained:

"The doctrine of invited error or acquiescence is a form of procedural default or estoppel. [Citation.] The doctrine provides that a party may not request the court to proceed in one manner and then argue on appeal that the requested action was error. [Citation.] The rationale for the doctrine is that it would be unfair to grant a party relief based on error that she introduced into the proceedings."

Based on the facts in this case, defendant cannot claim the court erred by not requiring him to be shackled, to be seated at a table away from McEldowney, or to participate in the proceedings remotely, as he argued on appeal. Had the court imposed any of these accommodations—which all could have negatively affected defendant—so McEldowney would feel secure continuing his representation of defendant, defendant would likely be arguing he was prejudiced by the accommodation(s).

¶ 101    Defendant also asserts the trial court should have appointed him a new attorney after McEldowney stated he did not believe he could effectively represent defendant. We disagree.

Based on the totality of the circumstances, the appointment of a new attorney for defendant would be a nonsensical result in this case. McEldowney's belief he could not effectively represent defendant was a result of defendant's severe misconduct, which occurred approximately two weeks before his trial was scheduled to begin.

¶ 102　　　Based on the record before us, defendant was clearly unhappy with the strategic decisions McEldowney was making and wanted a different attorney. As this court recently stated in *People v. Hughes*, 2025 IL App (4th) 240514, ¶ 149, it is bad policy for a trial court to reward a defendant for his misconduct. Had the court appointed defendant a new attorney, it would have been doing exactly that. In addition, the appointment of a new attorney would have resulted in a lengthy delay in the resolution of this criminal matter, which had been ongoing since October 2021 and was scheduled for trial two weeks after defendant threatened his counsel.

¶ 103　　　Although we need not go any further with our analysis for purposes of deciding this particular case, we stress this opinion does not stand for the proposition that any threat of violence by a defendant to his or her attorney automatically constitutes a forfeiture of the defendant's constitutional right to counsel. However, as this case shows, actual physical harm is not required before misconduct *can* be categorized as *severe misconduct* justifying the forfeiture of a defendant's constitutional right to counsel. See *Payton*, 2023 IL App (4th) 220890-U, ¶ 56 (citing *McLeod*, 53 F.3d at 325). That being said, when a trial court is determining whether a defendant has forfeited or waived his right to counsel, the court must act with "extreme care" and consider the totality of the circumstances before it. *Ames*, 2012 IL App (4th) 110513, ¶ 44.

¶ 104　　　We recognize this court in *Ames* stated that dealing with difficult defendants comes with the territory for court-appointed attorneys. *Id.* ¶ 48. The *Ames* court stated:

　　　　　"Cases involving such clients must still go forward, and court-appointed counsel

- 35 -

should understand that (1) they can do no more than their best under difficult circumstances and (2) in most instances, there is no reason to believe *** that any other court-appointed attorney will be able to do better.

Trial courts should not hesitate to reject motions to withdraw filed by court-appointed counsel when those motions are based on the ground that the relationship between the defendant and counsel has become 'poisonous' or unpleasant due to the defendant's bad behavior. Instead of granting such motions, the court should make clear to the defendant that (1) failing to cooperate with his counsel will hurt only the defendant and (2) the court will not replace counsel. ***

Despite the difficulties court-appointed counsel may encounter representing an obstructionist defendant determined to interfere with an orderly and constructive attorney-client relationship, trial courts should almost never permit such counsel to withdraw from representing that defendant. A trial court's doing so only rewards and enables bad behavior. Courts delude themselves by thinking an obstructionist defendant is somehow going to behave better when a new court-appointed counsel enters the picture." *Id.* ¶¶ 48-50.

However, this does not mean a court should force a court-appointed attorney to continue representing a defendant who has threatened to or has physically harmed his attorney. Even if a court finds a defendant's misconduct is not severe enough to justify the forfeiture of the defendant's right to counsel but concludes defense counsel's concerns for his or her safety or that of his or her family are sincere and valid, the trial court should not hesitate to grant defense counsel's motion to withdraw.

¶ 105    Because we have found the trial court did not make a clear or obvious error by

ruling defendant forfeited his right to counsel by threatening McEldowney, we need not address the State's argument defendant also waived his right to counsel.

¶ 106                                    B. Defendant's Alibi Defense

¶ 107        Defendant next argues the trial court violated his right to a fair trial by denying him the ability to present an alibi defense. According to defendant, "the court erred by binding him to prior counsel's undisclosed decision to abandon an alibi defense." In response, the State again cites *Sebby*, 2017 IL 119445, ¶ 48, for the proposition defendant forfeited this issue because he failed to raise it in his posttrial motion. Further, citing *People v. Moon*, 2022 IL 125959, ¶¶ 20-24, the State argues defendant cannot establish his forfeiture should be excused pursuant to the plain error doctrine.

¶ 108        We will only disturb a trial court's decision to impose sanctions for discovery violations if the court abused its discretion. *People v. Houser*, 305 Ill. App. 3d 384, 390 (1999). Citing *Houser*, defendant argues the trial court abused its discretion because it did not consider available alternatives in lieu of barring the alibi witnesses. See *id.*

¶ 109        On May 28, 2024, the first day of defendant's trial, the State advised it had not received notice from defendant regarding the anticipated testimony of Jamal Porter, Breaisia Runyon, and Antonio Taylor. Defendant responded these witnesses would testify he was at 321 East Frye Avenue in Peoria at the time Snipes was shot. The State objected and argued that defendant never gave the State notice he would be pursuing an alibi defense. The trial court asked McEldowney whether he and defendant ever discussed an alibi defense. McEldowney said he and defendant discussed the alibi defense and disagreed about its strategic value. McEldowney indicated he had not filed anything related to the alibi defense.

¶ 110        The State then asked the trial court to rule defendant violated the rules of discovery

and bar defendant from calling those three witnesses. According to the State, it should not have to try to locate and interview witnesses about an alleged alibi after the jury was selected in this case. The State argued the court should bar those witnesses or continue the trial because anything else would place the State at a disadvantage during defendant's trial. However, defendant objected to a continuance. Even after the court explained the reason for the State's request for a continuance was defendant's failure to disclose his alibi defense, defendant maintained his objection to the continuance. The State noted it had filed a written motion in November 2021 for defendant to disclose his defenses. The court then stated:

"There were so many deadlines that have come and gone in the case regarding motions and a disclosure of an alibi defense was Counsel's decision to make and he consciously didn't make it for the reasons mentioned without going into specifics. So, your record is protected.

The State's motion to bar those witnesses from testifying that you were at the Frye address at the time of the occurrence is granted. Your record is protected in the event there's ever an argument—and I'm not saying there is—that Counsel made the incorrect decision. When you lose counsel before trial, normally ineffective assistance of counsel argument doesn't apply. That's for a later date. Your record is protected."

Although the State argued the undisclosed witnesses should be completely barred, the court ruled it would allow the witnesses to provide limited testimony, but they could not testify regarding an alibi for defendant for the period between 4:10 a.m. and 5:10 a.m.

¶ 111     Citing *Faretta v. California*, 422 U.S. 806, 819-20 (1975), defendant argues the sixth amendment (U.S. Const., amend. VI) places ultimate control of the defense to the accused,

not his former attorney. Defendant also cites *McCoy v. Louisiana*, 584 U.S. 414, 426-27 (2018), for the proposition counsel cannot usurp control over an issue that is within a defendant's sole prerogative. According to defendant:

> "A *pro se* defendant has lost the autonomy to control his defense when a discharged attorney is allowed to control strategic decisions, including whether to assert an alibi. By crediting prior counsel's silent abandonment of an alibi and precluding the alibi testimony that [defendant] sought to present, the trial court let a former lawyer 'usurp control' of a decision that *Faretta* and *McCoy* reserve to the *pro se* defendant."

¶ 112       We note defendant is correct the sixth amendment grants a defendant the right to make his own defense. *Faretta*, 422 U.S. at 819. However, when a defendant chooses to accept an attorney as his representative, the Supreme Court made clear that "law and tradition may allocate to the counsel the power to make binding decisions of trial strategy." *Id.* at 820. In this case, counsel was not thrust upon defendant. As the State notes in its brief, defendant was originally represented by Toner. Defendant then decided he wanted to represent himself and was allowed to do so. Yet, even during his own self representation, defendant failed to raise or advise the State of his alibi defense or the pertinent witnesses. Later, defendant asked the court to again appoint an attorney to represent him in this case, which the court did. Ultimately, defendant was represented by McEldowney until he lost his right to counsel because of his severe misconduct.

¶ 113       As for defendant's argument McEldowney infringed on his rights by determining not to pursue his alibi defense, we find this argument meritless. Defendant is correct that he did not surrender all control of his defense when he requested appointment of a public defender. See *McCoy*, 584 U.S. at 421 ("To gain assistance, a defendant need not surrender control entirely to

counsel."). However, in *McCoy*, the Supreme Court stated:

> "Trial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' [Citation.] Some decisions, however, are reserved for the client— notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forego an appeal." *Id.* at 422.

At issue here is defense counsel's decision not to pursue an alibi defense.

¶ 114      According to the Illinois Supreme Court, whether to present an alibi defense is a matter of trial strategy and is normally left to the discretion of defense counsel. *People v. Jackson*, 2020 IL 124112, ¶ 106. As a result, defense counsel did not infringe on a decision completely under defendant's control. At the hearing on McEldowney's motion to withdraw, McEldowney told the court he and defendant had disagreed on whether to present an alibi defense. McEldowney indicated he decided not to pursue that defense based on his review of the discovery in this case. This decision was made by McEldowney while he was representing defendant.

¶ 115      Defendant also asserts the trial court abused its discretion because it did not consider any sanctions less severe than barring defendant's three alibi witnesses from testifying. From our review of the record, the court clearly considered other ways to deal with this situation, as opposed to simply barring the alibi witnesses from testifying. Primarily, the court considered continuing the case. However, defendant objected to the continuance. We also note the witnesses were, in fact, not completely barred from testifying, which limited the sanction. They just were not allowed to attempt to establish an alibi for defendant.

¶ 116      Based on the record in this case, the trial court did not commit a clear or obvious

error by barring defendant's alibi witnesses from providing testimony as to defendant's whereabouts at the time of Snipes's murder. The court considered continuing the case, presumably so defendant could call these witnesses. However, defendant objected to the continuance.

¶ 117                                    C. The Grand Jury's Indictment

¶ 118        Defendant next argues the trial court erred by denying his motion to dismiss the grand jury's indictment. According to defendant, Detective Hulse misrepresented to the grand jury what Hermacinski told the police regarding defendant, which misled the grand jury and violated defendant's due process rights. Defendant bases his argument on the following testimony by Detective Hulse:

> "[Hermacinski] drove over to the city of Peoria and picked [Moore] and a guy named Guwop, street name for Gary Irby, up. They drove around multiple places in the city of Peoria during the next several hours[,] one of which was the McDonald's on Knoxville; the other one being the Taft Homes. She indicated they returned to Mr. Irby's residence on East Frye, specifically 321, and that they then asked for a ride over on to Linn Street to see a guy named Luke."

Defendant asserts the State made it appear Hermacinski had identified "Guwop." as "Gary Irby." However, Hermacinski told the police she did not know "Guwop's" real name.

¶ 119        Defendant cites *People v. DiVincenzo*, 183 Ill. 2d 239, 257 (1998), for the proposition the State violates a defendant's due process rights when it presents deceptive, misleading, or inaccurate evidence to a grand jury. According to defendant, the State's misrepresentation of the information Hermacinski provided the police "was deceptive and misleading, because it distorted the extent to which their chief witness *** implicated [defendant] by name." Regardless of the State's intent, defendant argues the trial court should have dismissed

the indictment with prejudice because Detective Hulse's misleading and deceptive testimony was crucial to the grand jury's probable cause determination. In response, the State argues defendant forfeited this claim because he did not include it in his posttrial motion. *Sebby*, 2017 IL 119445, ¶ 48. Further, according to the State, defendant cannot establish we should excuse the forfeiture pursuant to the plain error doctrine.

¶ 120 Whether a defendant was denied due process is a question of law, which we review *de novo*. *People v. Basile*, 2024 IL 129026, ¶ 24. Our supreme court recently noted "the importance of preserving the historic independence of the grand jury" and its reluctance to interfere with the indictment process. *Id.* ¶ 30 (citing *People v. Fassler*, 153 Ill. 2d 49, 58 (1992)). However, the supreme court explained courts have the "inherent power to supervise and prevent perversion of the grand jury's process," which includes the authority to dismiss an indictment when a clear denial of due process has occurred. *Id.* ¶ 32. That being said, according to our supreme court, when a court is asked to dismiss an indictment based on an alleged denial of due process, the court must act with restraint and find a denial of due process only if it is certain. *Id.* ¶ 33. "Therefore, a defendant seeking to dismiss a grand jury's indictment on due process grounds has the difficult burden of showing that the denial of due process is unequivocally clear and that he or she suffered actual and substantial prejudice." (Internal quotation marks omitted.) *Id.* While a defendant can challenge an indictment procured through prosecutorial misconduct, the record must unequivocally show the misconduct rose to the level of a deprivation of due process or a miscarriage of justice. *Id.* ¶ 38. "A defendant seeking to have a grand jury's indictment dismissed on grounds of prosecutorial misconduct faces a formidable task." *Id.* ¶ 39. "To establish that prosecutorial misconduct before a grand jury resulted in actual and substantial prejudice, a defendant must show more than its mere existence." *Id.* ¶ 41.

¶ 121    Defendant asserts Detective Hulse's comment that Hermacinski told the police "Guwop's" real name was "Gary Irby" was crucial to the grand jury returning the bill of indictment. According to defendant:

> "If Hulse had been more clear and honest with the grand jury, the grand jury would have been advised only that GPS data put Gary in the vicinity of those occurrences, and that he was later found to be in possession of a cell phone that Tyranique White was texting that morning. [Citations.] The grand jury would have had no information connecting Gary to the possession of any firearms, or to the shooting, or even to the identity of Guwop. The grand jury could not have indicted Gary for murder, either as the primary culprit or through accountability, on the strength of that evidence."

We disagree.

¶ 122    Based on the record in this case, it is not clear Detective Hulse's testimony misled or deceived the grand jury because we are unable to observe the manner in which the detective delivered his testimony. Further, on appeal, defendant does not argue "Guwop" was not a street name by which he was known. Regardless, even assuming, *arguendo*, Detective Hulse's statement potentially misled the grand jury, defendant cannot establish the grand jury would not have indicted defendant without believing Hermacinski told the police that "Guwop" was defendant's street name.

¶ 123    Even if Hermacinski only identified Moore but did not provide the police with any information regarding the identity of the other man she drove to the scene of Snipes's murder, the grand jury would have still heard the following information: (1) Hermacinski took Moore and an unidentified man to an area near where the shooting occurred; (2) Moore exited Hermacinski's

- 43 -

vehicle with a shotgun; (3) the unidentified man exited the vehicle with a semiautomatic handgun; (4) Moore and the unidentified man returned to her vehicle after she heard several gunshots; (5) Hermacinski then drove Moore and the unidentified man back to 321 East Frye Avenue; and (6) GPS data indicated defendant and Moore were together both before the shooting, at the scene of the shooting when it occurred, and after the shooting. The grand jury could have easily determined defendant was the unidentified man in Hermacinski's vehicle based on this information. As a result, defendant cannot establish the trial court made a clear or obvious error by denying his motion to dismiss the indictment.

¶ 124                                    D. Sentence

¶ 125        We next turn to defendant's sentencing argument. In this case, defendant argued in his amended motion to reconsider his natural life sentence that *Miller* applied to him because he was under the age of 21 when the charged offense occurred. Defendant alleged new scientific evidence established that young people between the ages of 18 and 25 are developmentally different from adults 26 and older. Defendant asserted, "[O]ur courts now recognize 'that brain development research and conclusions are evolving in support of the future,' and argued that the trial court 'abused its discretion sentencing defendant due to [the] Eighth Amendment and *Miller*.' "

¶ 126        At the hearing on defendant's amended motion to reconsider his sentence, the trial court stated, "*Miller* does not apply to adults. You were an adult at the time this occurred." According to defendant, this statement shows the court did not understand the current state of eighth amendment (U.S. Const., amend. VIII) law, the Illinois sentencing law for emerging adults, and the developments regarding Illinois's proportionate penalties clause (Ill. Const. 1970, art. I, § 11) following *Miller*. Defendant also argues the court did not recognize it had discretion to allow

- 44 -

an emerging adult's as-applied challenge that his sentence violated the proportionate penalties clause of the Illinois Constitution because of the emerging adult's age, background, and other relevant factors.

¶ 127    Without addressing defendant's specific arguments regarding the current state of the law, this court presumes a trial court knows the law, properly applied the law, and imposed a proper sentence absent an affirmative showing of error. *People v. Smith*, 176 Ill. 2d 217, 260 (1997). From our review of defendant's appellant's brief, he failed to point this court to anything in the record affirmatively showing the trial court did not understand eighth amendment law, the Illinois law regarding emerging adults, or the applicability of our state constitution's proportionate penalties clause to sentences imposed on emerging adults.

¶ 128    The trial court's statement that *Miller* did not apply to defendant is legally correct and provides no indication the court did not understand Illinois law regarding emerging adults. See *People v. Spencer*, 2025 IL 130015, ¶ 32 ("*Miller* only applies to juveniles and does not apply to emerging adults.") Moreover, it was defendant who cited *Miller* in his amended motion to reconsider. The court did not state defendant's status as an emerging adult somehow barred him from claiming his sentence violated the Illinois proportionate penalties clause.

¶ 129    In *Spencer*, our supreme court explained that a defendant may make an as-applied challenge to his sentence pursuant to the Illinois proportionate penalties clause for a sentence of any length and noted it had "not barred young adult defendants from raising as-applied proportionate penalties clause challenges to life sentences based on the evolving science regarding juvenile maturity and brain development." *Id.* ¶¶ 42-43. However, the supreme court also stated: " 'All as-applied constitutional challenges are, by definition, reliant on the application of the law to the specific facts and circumstances alleged by the challenger.' " *Id.* ¶ 44 (quoting *People ex rel.*

*Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 31). Therefore, according to the supreme court, it is crucial for the defendant to develop the record regarding the facts and circumstances upon which he is relying to establish his sentence violates the proportionate penalties clause. *Id.*

¶ 130 At defendant's sentencing hearing, defendant provided the trial court with little additional information regarding his particular circumstances not found in his PSI. His sister wrote defendant was a caring, loving, and respectful person who loved his nieces and nephews, worked at Caterpillar and Casey's General Store, and had earned his GED. Defendant's grandfather wrote that defendant was a hard worker who had worked at Caterpillar, helped cut grass, and helped people move. Defendant's grandfather also wrote he believed defendant had been framed and did not kill anyone. Because defendant provided the court with little additional information about himself, the court was left to rely on defendant's extensive PSI when considering defendant's history and personal circumstances.

¶ 131 Further, in the process of asking the trial court to reconsider his sentence, defendant again provided the court with little additional information about his personal circumstances and history. Defendant also did not ask the court to hold an evidentiary hearing so he could introduce evidence to establish his natural life sentence violated the proportionate penalties clause based on his specific circumstances.

¶ 132 "The purpose of a motion to reconsider sentence is not to conduct a new sentencing hearing, but rather to bring to the circuit court's attention changes in the law, errors in the court's previous application of existing law, and newly discovered evidence that was not available at the time of the hearing." *People v. Burnett*, 237 Ill. 2d 381, 387 (2010). Because defendant did not provide the trial court with any additional information related to his personal circumstances when reconsidering the sentence it imposed, defendant cannot complain the court failed to consider facts

and circumstances that were not brought to its attention.

¶ 133    Before the trial court sentenced defendant, it noted it had considered defendant's PSI (which was approximately 270 pages in length), arguments made by the State and defendant, defendant's statement, and all the statutory factors in aggravation and mitigation. The court stated: "I'll attempt to cover what I feel is important, but just because one might be left out does not mean they all haven't been considered. I've considered the history and character of the defendant." Moreover, in explaining its decision to sentence defendant to a term of natural life in prison, the court first noted three individual lives were essentially over because of defendant's actions, including the victim, Snipes; Moore, who was convicted in a separate case and sentenced to 80 years in prison; and defendant. Further, the court noted White's fate was still to be determined. While finding Moore's conduct was both egregious and heinous, the court asserted defendant was the ringleader and orchestrated Snipes's murder. Defendant directed Hermacinski to pick Moore and himself up and directed her where to take them under threat. Further, the court stated defendant fired the first eight or nine shots into the victim's back in what was a planned ambush of Snipes.

¶ 134    The trial court noted defendant had maintained his innocence at the sentencing hearing in the face of overwhelming evidence. In addition, the court observed defendant's assertion he was a law-abiding citizen was shocking but consistent with defendant's documented lies and history of ignoring reality. While the court recognized defendant was only 19 when he killed Snipes, the court indicated defendant had a significant history of delinquency and criminal activity. According to the court, "One reason your adult criminal history isn't worse is because you were either incarcerated during most of your adult years and/or only 19 at the time of this incident. So you were an adult for a year and some months and were incarcerated during the course of that." As for defendant's juvenile record, the court noted defendant had a prior Class 2 felony burglary

conviction and a prior battery conviction and was awaiting a retrial on a home invasion charge. The court also mentioned defendant had caused problems at school and the juvenile detention center.

¶ 135    Despite the exorbitant costs to Illinois taxpayers, the trial court found a sentence of imprisonment was necessary and imposed a natural life sentence on defendant. Based on the information the court had at the time of sentencing and the arguments presented on appeal, the court did not abuse its discretion in imposing this sentence on defendant. Further, based on the arguments and lack of information provided to the court regarding defendant's request the court reconsider his sentence, the court did not err in denying defendant's request.

¶ 136                               III. CONCLUSION

¶ 137    For the reasons stated, we affirm the trial court's judgment.

¶ 138    Affirmed.

*People v. Irby*, 2026 IL App (4th) 241389

| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 21-CF-701; the Hon. Paul P. Gilfillan, Judge, presiding. |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and James Henry Waller, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and Matthew S. Goldman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |